## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### EASTERN DIVISION

W.T. PAINE                                                                      PLAINTIFF

v.                              No. 2:07CV00124 JLH-BD

JEFFERSON NATIONAL LIFE
INSURANCE COMPANY f/k/a CONSECO
VARIABLE LIFE INSURANCE COMPANY;
and PROTECTIVE LIFE INSURANCE COMPANY                    DEFENDANTS

## RECOMMENDED DISPOSITION

**I.      Procedures for Filing Objections:**

The following recommended disposition has been sent to Chief United States

District Judge J. Leon Holmes.  Any party may serve and file written objections to this

recommendation.  Objections should be specific and should include the factual or legal

basis for the objection.  If the objection is to a factual finding, specifically identify that

finding and the evidence that supports your objection.  Your objections must be received

in the office of the United States District Court Clerk no later than eleven (11) days from

the date you receive the Recommended Disposition.  Failure to file timely objections may

result in a waiver of the right to appeal questions of fact.

**II.     Background:**

On January 7, 1988, Plaintiff W.T. Paine, M.D. purchased fifteen (15) life

insurance policies from Union Life Insurance Company ("Union Life") for one hundred

thousand dollars ($100,000.00) each, for a total of one million, five hundred thousand

dollars ($1,500,000.00).  This case involves thirteen of those Union Life policies (the

"Policies").[1]  All of the Policies are identical in their terms and conditions.

Through a series of mergers, stock purchases, and name changes, Union Life

became Conseco Variable Insurance Company ("Conseco") which in June, 2003, changed

its name to Jefferson National Life Insurance Company ("Jefferson"). On March 29,

2002, Protective Life Insurance Company ("Protective") entered into a Coinsurance

Agreement with Conseco to assume "Contractual Liability" for certain insurance policies,

including the Policies at issue in this case.  A June, 2003, letter to Plaintiff advised him of

Conseco's name change to Jefferson and that the Policies would be administered by

Protective.[2]

When Plaintiff was considering purchasing the Policies in 1988 he met with Ben

Becker, who sold Union Life policies in and around Helena, Arkansas.  Becker arranged

for Plaintiff and his full-time business manager, Don Thomas, to meet Anthony W.

Fakouri, an employee of Union Life.  At the meeting, Mr. Fakouri told Plaintiff about the

policies.  Specifically, Mr. Fakouri told Plaintiff that the policies earned interest at a

guaranteed minimum  rate of 6% per year, and that the insured could borrow against the

interest earnings on the policies.  By using a "zero-net-cost loan," Plaintiff could avoid

---

[1]At issue are policies numbered: 01UE284235, 01UE284236, 01UE284237,
01UE284238, 01UE284239, 01UE284240, 01UE284241, 01UE284242, 01UE284243,
01UE284244, 01UE284249, 01UE284251, and 01UE284276.

[2]Throughout the remainder of this Recommended Disposition, the Court will refer
to both Conseco and Jefferson as "Jefferson."

2

tax liability on the interest earnings.  Mr. Fakouri explained that by borrowing only the

guaranteed 6% earnings on the policies, there would be no effect on the guaranteed cash

value or the guaranteed death benefit set forth in the policy.  Plaintiff purchased the

Policies in 1988 and read the Policies when he received them.  (docket entry #55-3[3] at pp.

4, 11)  The Policies provide:

<strong>This policy is a legal contract between<br>you and us<br>READ YOUR POLICY CAREFULLY</strong>

> We will pay the proceeds of this policy to the owner on the maturity date if
> the insured is living on that date.  Upon our receipt at our Home Office of
> due proof that the insured died before the maturity date and while this
> policy was in force, we will pay to the beneficiary, the death benefit, less
> any indebtedness, as specified in the Death Benefit provision.

(#55-2 at p. 1) (bold in original).

> The Policies define the terms "proceeds" and "indebtedness" as follows:

> **PROCEEDS.**  Proceeds means the amount payable on the maturity date, on
> the surrender of this policy prior to the maturity date, or upon the death of
> the insured.

> The proceeds payable on death will be the death benefit less any
> indebtedness.  If the policy is surrendered, the proceeds will be the cash
> surrender value.  On the maturity date, the proceeds will be the cash value
> less any indebtedness.

* * *

---

[3]The exhibits the parties have filed with the Court using its CM/ECF system were assigned a unique number and page number which appears as a header on the top of each page of the document.  Throughout this Recommended Disposition, the Court will refer to all documents by their header number.

> **INDEBTEDNESS.** Indebtedness means all existing loans on this policy
> plus earned interest which has either accrued or been added.

(#55-2 at pp. 7, 10) (bold in original).

The Policies include a merger clause which provides, "[t]he entire contract consists of this policy and the application, a copy of which is attached." (#55-2 at p. 7) They also include a provision that states, "[t]he only way your policy may be changed is by written agreement. . . . No agents or other person has our permission to tell you that one or more of its terms or provision do not apply to you." (#55-2 at p. 7) Plaintiff had the right to cancel the Policies and receive a full refund of his premium payments any time within one year after he received them. (#55-2 at p.1)

The Policies earned 8.5% interest for the first year, greater than the guaranteed minimum 6%. In 1989, Mr. Fakouri submitted a request, on Plaintiff's behalf, for an interest-only loan on the Policies, and Plaintiff began receiving loan checks. The loan request form that Plaintiff signed when he requested the loan contained the following language: "BY SIGNING BELOW, OWNER OF POLICY ACKNOWLEDGES THAT ANY LOAN REQUESTED IS A FIRST LIEN ON THE POLICY WHICH SHALL BE DEDUCTED FROM ANY BENEFITS OR NONFORFEITURE VALUES." (#55-10 at p. 2)

In December 1990, Plaintiff wrote a letter to Jefferson requesting information about his Policies. He stated, "[o]n a recent status report I noticed that you state that the

4

death benefit on the policies will be reduced by any unpaid loans.  My rough calculations show that I have borrowed approximately $311,250 from my policies.  Does this mean that my current death benefit is calculated as follows?"  (#55-13 at p. 1)  Plaintiff went on to write, "[t]aking it a step further, if I continue to borrow $120,000 per year out of my 15 policies this would put my total loan valued in 10 years at approximately $1,511,250. . . ." (#55-13 at p. 1)

On January 9, 1991, Ann Bowman, a Senior Analyst with Jefferson, sent Plaintiff a letter responding to his questions.  (#55-14)  Ms. Bowman enclosed pages five and six of one of Plaintiff's Policies with her letter and set forth an example for calculating the death benefit.  She wrote, "[i]f a loan is taken the death benefit will be reduced by the amount of the outstanding loan at death."  (#55-14)  Ms. Bowman went on to write, "if the loan balance is equal to or less than the interest earned, the death benefit would never be less than the total premiums paid.  If, however, the loan balance exceeded the interest earned, the death benefit could possibly be less than the premium paid."  (#55-14)

In January 1994, Jefferson began exercising its right under the Policies to deduct the cost of insurance each month from the cash value of the Policies.[4]  (#55-2 at pp. 5, 6,

---

[4]The Policies provide that, "the monthly deduction for a policy month is the cost of insurance for the policy month."  (#55-2 at p. 9)  The cost of insurance is calculated using a formula set forth in the Policies.  (#55-2 at p. 9)  The Policies provided that the cost of insurance could not exceed rates shown on the Policy Information page.  (#55-2 at pp. 5, 6, and 9)

and 9)  The cost of insurance was reflected on Plaintiff's annual statements.  (#55-15, pp. 1-40)

In 1997, Plaintiff requested the amount required to pay off loans secured by three of his Policies.  Jefferson's response to the inquiry concerned Plaintiff, because he thought he was being charged excessive interest.  Plaintiff requested an investigation, and Jefferson found an error in the interest calculation on his Policies.  (#55-16)  As a result of the calculation error, in December, 1997, Jefferson sent Plaintiff a letter explaining their error and enclosed a "Loan Recalculation" page showing cumulative loan balances for each policy.  (#55-16)

In December, 2000, Plaintiff surrendered two of the fifteen policies he originally had purchased.[5]  Plaintiff signed a "request to surrender" form indicating he understood that the net cash value he would receive upon surrender of each policy would be calculated by deducting any outstanding loan balance and applicable surrender charges from the gross cash value of the policy.  (#55-4)  Upon surrendering the two policies, Plaintiff received net cash value checks for $81,661.32 and $82,519.44.  (#55-18 at p.2)

In 2002, Plaintiff's monthly loan checks stopped without explanation.  On September 1, 2002, Plaintiff's counsel sent a letter to counsel for Jefferson threatening litigation because "past payments [to Plaintiff] are [being] treated by Conseco as policy loans."  (#55-19 at pp. 1-2)  On September 25, 2002, Plaintiff's counsel followed up with

_____

[5]Plaintiff surrendered policy numbers 15UE284185 and 15UE284234.

6

another letter arguing that Plaintiff's policy values had been calculated improperly.  (#55-20 at pp. 1-2)  She wrote:

> As you are aware, there still remains a significant dispute as to the accounting on the 13 remaining policies.  Dr. Paine's receipt and cashing of the check does not alter his position that he has guaranteed death benefits of $154,478 per policy, for a total sum of $2,008,214.  The monthly payments, which have always equaled the guaranteed interest sum of 6%, should not be charged against the policies' cash value and pursuant to the policy, the cash value after 14 years should be at least $132,158.47 per policy, for a total sum in excess of $1,700,000.

(#55-20 at p. 1)

Protective began administration of the Policies on July 1, 2003.  (#61 at p. 3)  On July 10, 2003, Protective sent Plaintiff a letter confirming that it had processed his "request for a loan" and mailed him a check.  The letter went on to explain that, "the interest charged on your loan may be greater than the interest earned on your cash value securing the loan."  (#73-2 at p. 16)  The $6,500 check dated July 7, 2003, that Plaintiff received included Protective's standard endorsement that read in part, "[I]f this check is for a loan(s), it is subject to the terms of the policy(s) identified on this check's stub.  By endorsing this check, each payee assigns the policy(s) as of the date of this check to: Protective Life Insurance Company as security for said loan(s) and interest thereon."  After receiving the check, Plaintiff advised Protective that he would not accept the check with the endorsement and requested that they send him an "interest earnings" check without the endorsement.  (#82 at p. 7, ¶38)  Protective refused to remove the

endorsement but continued to send Plaintiff checks which he did not cash.  (#82 at p. 7, ¶39)

## III.   **Procedural History**:

Plaintiff filed this lawsuit in the Circuit Court of Phillips County, Arkansas on August 17, 2007.  The case was removed to the District Court on September 21, 2007.  Soon after removing the case, Plaintiff filed an Amended Complaint raising the following claims:  (1) breach of contract; (2) deceptive trade practices in violation of Ark. Code Ann. § 23-66-206; (3) intentional infliction of emotional distress/outrage; and (4) attorney's fees and 12% penalty damage.  Plaintiff has a pending motion to file a second amended complaint.  Plaintiff raises the following claims in his proposed second amended complaint: (1) declaratory judgment; (2) breach of contract; (3) deceptive acts or practices in violation of Ark. Code Ann. § 23-66-206; (4) bad faith; (5) fraudulent misrepresentation; (6) enhanced penalties under Ark. Code Ann. § 4-88-201, *et seq*.; and (7) attorney's fees and 12% penalty.

The District Court has referred (#65 and #86) the following motions to this Court: Plaintiff's Motion to file Amended Complaint (#42); Plaintiff's Motion to Compel (#44); Defendant Jefferson's Motion to Compel (#45); Defendant Jefferson's Motion for Summary Judgment (#53); Defendant Jefferson's Motion to Exclude Testimony of Plaintiff's Expert (#57); Defendant Protective's Motion for Joinder and Adoption of Jefferson's Motion for Summary Judgment (#59); Defendant Protective's Motion to

8

Exclude Testimony of Plaintiff's Expert (#60); and Defendant Protective's Motion for

Summary Judgment (#62).  For the reasons set forth below, the Court recommends that

the District Court GRANT Defendants' Motions for Summary Judgment, DENY

Plaintiff's Motion to file Second Amended Complaint, and DISMISS all other pending

motions as moot.

**IV.**   **Defendants' Motions for Summary Judgment:**

    **A.**   **Standard**

Summary judgment is appropriate when the evidence, viewed in the light most

favorable to the nonmoving party, presents no genuine issue of material fact.  FED. R.

CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 246 (1986).  "[T]he mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material fact."

*Anderson*, 477 U.S. at 247-48 (emphasis omitted).  If the opposing party fails to carry that

burden or fails to establish the existence of an essential element of its case on which that

party will bear the burden of proof at trial, summary judgment should be granted.  See

*Celotex*, 477 U.S. at 322.  A genuine issue of material fact exists only if there is sufficient

evidence for a jury to return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at

249.

### B.      Breach of Contract

1.      Statute of Limitations

Defendants argue that Plaintiff's breach of contract claim is barred by the statute of limitations.  Because Plaintiff's breach of contract claim is based on the written insurance Policies he purchased from Defendants in January 1988, the applicable statute of limitations for Plaintiff's breach of contract claim is five years.  See ARK. CODE ANN. § 16-56-111 (Lexis 2005).

When the statute of limitations is raised as a defense, the defendant has the burden of affirmatively pleading the defense.  *First Pyramid Life Ins. Co. v. Stoltz*, 311 Ark. 313, 317, 843 S.W.2d 842 (1992), *cert. denied*, 510 U.S. 908, 114 S.Ct. 290, 126 L.Ed.2d 239 (1993).  When it is clear from the face of the complaint, however, that the action is barred, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the statute of limitations was, in fact, tolled.  *Id*. at 317-18.

Defendants assert that Plaintiff's breach of contract claim is based on his contention that Defendants began miscalculating the value of the Policies, and thus Defendant's claim the cause of action accrued when Plaintiff began borrowing money against the Policies in February of 1989.  (#54 at p. 19)  Plaintiff, on the other hand, argues that the claim did not accrue until he knew of the breach on January 25, 2006, when "Jefferson acknowledge[d] ownership of the Policies" in a letter written to the Arkansas Insurance Department.  (#80 at p. 10)

Plaintiff's argument is contrary to Arkansas law which provides that, absent fraudulent concealment, a cause of action accrues and the statute of limitations begins to run the moment the right to commence an action comes into existence, not when the cause of action is discovered. *Shelter Mut. Ins. Co. v. Nash*, 357 Ark. 581, 587-588, 184 S.W.3d 425, 428 (2004) (citing *Ray & Sons Masonry*, 353 Ark. 201, 216, 114 S.W.3d 189, 198 (2003); *Courtney v. First Nat'l Bank*, 300 Ark. 498, 780 S.W.2d 536 (1989)).

In his amended brief in response to Jefferson's motion for summary judgment, Plaintiff argues that Jefferson breached the contract by failing to administer the Policies in accordance with their terms. (#80 at pp. 13-14)  Specifically, Plaintiff claims that Defendants breached the Policies by failing to pay him "interest earnings" he was entitled to "as zero net cost loans," by deducting the cost of insurance from the Policies, and by miscalculating the cash values and death benefits on the Policies. (#80 at pp. 13-14)

Under Plaintiff's theory, his cause of action for breach of contract accrued, at the latest, in January of 1994, when Defendants began deducting the cost of insurance from the cash value of the Policies.  Plaintiff claims the deductions breached the Policies because they:  (1) reduced the cash value of the Policies each month, resulting in less interest earnings on the Policies; (2) reduced the amount he could borrow each month on a zero-net cost basis; and (3) went against representations Mr. Fakouri allegedly made that insurance would not deducted from his Policies.  In spite of the deductions for insurance, Plaintiff continued to take loans of $500.00 per month on each of the Policies.

11

As a result, beginning in January, 1994, Plaintiff began taking monthly loans on the Policies in excess of the interest earned.  Under the terms of the Policies, Defendants charged Plaintiff interest on those loans, and treated them as loans that had to be repaid or the amount deducted from the death benefits or cash surrender values of the Policies.

Plaintiff claims the contracts include terms that were not part of the written Policies.  Specifically, Plaintiff claims that in 1988, Mr. Fakouri guaranteed him a stream of tax free income at the guaranteed minimum interest rate of 6% per year and told him that he would not be charged insurance on the Policies.  (#82 at p. 2, ¶ 9; p. 3, ¶ 14) Plaintiff also claims that Defendants have breached what he calls the "course of dealing" of the parties.  Plaintiff asserts that the dealings between the parties over the years established an agreement by Defendants to reduce his monthly loan payments automatically to equal the interest earned on the Policies.

Under Arkansas law, the statute of limitations on oral contracts is three years. ARK. CODE ANN. § 16-56-105 (Lexis 2005).  Plaintiff acknowledges that Mr. Fakouri's statements were made in 1988.  Again, Plaintiff's breach of contract claim on any oral contract Plaintiff is alleging would have accrued, at the latest, in 1994, when Defendants began deducting for insurance on the Policies resulting in a breach when Defendants did not, upon the request of Plaintiff, adjust his monthly loan payments to account for the deduction.  Accordingly, even if Mr. Fakouri's statements and the course of dealings of

12

the parties established a separate contract, the contract claim is still barred by the statute of limitations.

Plaintiff's cause of action for breach of contract accrued, and the statute of limitations began to run, at the latest, in January, 1994. The statute of limitations expired, at the latest, in January, 1999, more than eight years before this lawsuit was filed. Accordingly, unless equitable tolling applies, Plaintiff's breach of contract claim is barred by the statute of limitations.

2.      Equitable Tolling

As an alternative to his argument that the cause of action accrued in January, 2006, Plaintiff argues that "equitable tolling" should apply because Defendants denied him "the information necessary to determine that Jefferson was breaching the contract." (#80 at p. 9)  Plaintiff claims that, until January, 2006, Defendants provided him with "non-answers to his questions regarding interest rates being charged, couching those non-answers in terms artfully designed to reassure Plaintiff that his policies were being administered according to the contract terms and the course of dealing between Plaintiff and Jefferson and its predecessors in interest." (#80 at p. 10)

Plaintiff claims the "equitable tolling doctrine allows a plaintiff to avoid the statute of limitations bar if, despite due diligence, he is unable to obtain important information regarding the existence of his claim." (#80 at p. 9)  Defendants argue that "equitable

tolling" is applicable only to federal statutory claims and does not apply to claims asserted under Arkansas state law.

Arkansas courts have recognized equitable tolling in cases of fraudulent concealment. See *Stracener v. Williams*, 84 Ark. App. 208, 213, 137 S.W.3d 428, 431 (2003) ("it is 'hornbook law' that limitations periods are customarily subject to equitable tolling unless it would be inconsistent with the relevant statute") (citing *Young v. United States*, 535 U.S. 43, 49, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002)).  Fraudulent concealment may suspend the statute of limitations until the party who has the cause of action discovers, or should have discovered, the fraud by exercising reasonable diligence.  *First Pyramid Life Ins. Co.*, 311 Ark. at 318.  Ignorance on the part of the plaintiff is not enough to suspend the statute of limitations.  *Id*. at 319.  Ignorance which is the result of an affirmative and fraudulent act of concealment, however, does suspend the running of the statute of limitations.  *Elder v. The Security Bank of Harrison*, 68 Ark. App. 132, 5 S.W.3d 78 (1999) (citations omitted).  Further, a failure to disclose may prevent the statute of limitations from running when there is an affirmative duty to speak.  *Id*.

While a question of fraudulent concealment is normally a question of fact that is not suited for summary judgment, Arkansas courts have held that when the evidence leaves no room for a reasonable difference of opinion, a trial court may "resolve fact issues as a matter of law."  *Varner v. Peterson Farms*, 371 F.3d 1011, 1016-1018 (8th Cir. 2004) (quoting *Alexander v. Flake*, 322 Ark. 239, 910 S.W.2d 190, 191 (1995)).

The facts in this case do not support Plaintiff's claim that Defendants took affirmative steps to fraudulently conceal his claims.  Plaintiff was given the original Policies when he purchased them in January, 1988.  He read the policies. (#55-3 at pp. 4, 11)  In a December 17, 1990 letter, Plaintiff acknowledged receiving a "recent status report" and noticed "the death benefit on the policies will be reduced by any unpaid loans."  In the same letter, Plaintiff calculated that he had already taken out a total of "roughly $311,250" in loans. (#55-13 at p. 1)  On January 9, 1991, Jefferson wrote Plaintiff to respond to his December, 1990, correspondence and told Plaintiff that the death benefit on his Policies might be reduced by the amount of any outstanding loan on the policy, if the loan value was equal to or less than the interest earned. (#55-14)  This statement was not ambiguous or misleading, but rather was in line with the terms of the Policies.

In December, 1997, Jefferson made Plaintiff aware of an error in its calculation of interest on the loan balances of his Policies. (#55-16 at p. 1)  Jefferson notified Plaintiff that the loan balances on all of his Policies had been recalculated. (#55-16 at pp. 1-2)  Jefferson gave Plaintiff a "detailed *Loan Recalculation'* page for each policy showing the errant loan calculation and the corrected loan recalculation." (#55-16 at pp. 4-19)  The "Loan Recalculation" page clearly shows loan balances on each of Plaintiff's Policies and indicates that Defendants did not take affirmative steps to conceal its alleged breach or to mislead Plaintiff about the Policies.

15

Plaintiff acknowledges that Jefferson provided him with annual statements on his policies between 1998 and 2002.  (#55-3 at pp. 25-26)  The annual statements reflected unpaid loans on the Policies.  (#55-3 at p. 26)

In December 2000, Plaintiff was again made aware of his loans against the Policies when he signed a "request to surrender" form for two of his policies that indicated that he understood the net cash value he would receive upon surrender would be calculated by deducting any outstanding loan balance on the policy and applicable surrender charges from the gross cash value of the policy.  Plaintiff acknowledges receiving two net cash value checks with deductions taken for outstanding loan balances on the policies.[6]  In the light of Plaintiff's acknowledgment of the deductions taken for outstanding loans from value checks he received and negotiated, Plaintiff cannot claim ignorance resulting from an affirmative and fraudulent act of concealment by the Defendants.

In 2002, Plaintiff retained counsel to represent him in matters relating to the Policies.  On September 1, 2002, Plaintiff's counsel sent a letter to counsel for Jefferson threatening litigation because "past payments [to Plaintiff] are [being] treated by Conseco as policy loans."  Not only was Plaintiff aware of Defendants' alleged breach of the

---

[6]Plaintiff received checks for $81,661.32 and $82,519.44 on his surrendered policies, significantly less than the $100,000 premium he paid for each policy in 1988.

16

Policies, but, on his behalf, counsel was threatening to bring the very lawsuit that he waited more than five years to bring.

Even in the case of fraudulent concealment, a litigant in Arkansas must show that he was reasonably diligent in order to take advantage of the doctrine of equitable tolling. See *Stracener v. Williams*, 84 Ark. App. 208, 137 S.W.3d 428 (citing *Smith v. St. Paul Fire & Marine Ins. Co.*, 76 Ark. App. 264, 64 S.W.3d 764 (2001)). Plaintiff has not established that Defendants took affirmative steps to conceal their alleged breach of the Policies or that he was reasonably diligent in bringing a claim to prevent the running of the statute of limitations. See *Hampton v. Taylor*, 318 Ark. 771, 887 S.W.2d 535 (1994) (affirming the grant of summary judgment because mere allegations of fraud, unsupported by evidence, are not enough to create an issue of material fact on whether the statute of limitations should be tolled for fraudulent concealment).

The statute of limitations began to run on Plaintiff's breach of contract claim, at the latest, in January, 1994, and expired on January 31, 1999, more than eight years before this lawsuit was filed. Accordingly, the Court recommends that the District Court grant Defendants' motions for summary judgment on Plaintiff's breach of contract claim.

### C.    Intentional Infliction of Emotional Distress/Outrage

In his Amended Complaint, Plaintiff asserts a claim for intentional infliction of emotional distress/outrage. Under Arkansas law, the limitations period for the tort of outrage is three years. ARK. CODE ANN. § 16-56-105 (Lexis 2005). Accordingly, the tort

claim is barred if it accrued before August 17, 2004.  At his deposition, Plaintiff alleged that he had suffered emotional distress from Defendants' allegedly outrageous conduct in 2002.  (#55-2 at p. 22)  Based on Plaintiff's testimony, his emotional distress/outrage claim is barred by the statute of limitations, and the Court recommends that the District Court grant Defendants' motions for summary judgment on the claim.

### D.      Arkansas Deceptive Trade Practices Act

Plaintiff also claims Defendants have violated the Arkansas Deceptive Trade Practices Act ("the Act").[7]   While the Act gives the state authority to establish rules of conduct and punish offenders, it does not give private individuals, who are insured, the authority to bring a private cause of action against an insurance company for violations of the Act or for violations of regulations promulgated under the Act.  See ARK. CODE ANN. § 23-66-202(b); *Design Professionals Ins. Co. v. Chicago Ins. Co.*, 454 F.3d 906, 911-912 (8th Cir. 2006); *Columbia Mut. Ins. Co. v. Home Mut. Fire Ins. Co.* , 74 Ark. App. 166, 175, 47 S.W.3d 909, 914 (2001).  Because under the Act Defendants owe a duty to the state, and not to the insured, Plaintiff does not have a private right of action against Defendants under the Act.  Accordingly, the Court recommends that the District Court grant Defendants' motions for summary judgment on Plaintiff's claim under the Act.

---

[7]Plaintiff does not allege an emotional distress/outrage claim in his proposed Second Amended Complaint.  (#42-2 at pp. 14-21)

**V.**   **Plaintiff's Motion for Leave to File Second Amended Complaint**:

Plaintiff seeks leave to file a Second Amended Complaint which adds claims for bad faith, fraudulent misrepresentation, declaratory judgment and enhanced penalties under Ark. Code Ann. § 4-88-201 *et seq*.  (#42-2 at pp. 14-20)   Defendant Jefferson objects to the motion, arguing that Plaintiff inappropriately waited until the end of discovery to file the motion adding new claims.  (#43)

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend should be "freely given when justice so requires."  However, "denial of leave to amend may be justified by undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party." *United States ex rel. Gaudineer & Comito, L.L.P. v. Iowa*, 269 F.3d 932, 936 (8th Cir. 2001) (internal quotation omitted).

As set forth below, the Court recommends that the District Court deny Plaintiff's motion to amend, because the amendments are futile.

**A.**   **Bad Faith**

In his proposed Second Amended Complaint, Plaintiff claims it was bad faith for Defendants to refuse to investigate his claims regarding his Policies despite "repeated requests made over a period of seven years."  Plaintiff's claim of bad faith is barred by

Arkansas's three-year statute of limitations  if it accrued before August 17, 2004.[8]  ARK.

CODE ANN. § 16-56-105 (Lexis 2005).

According to the facts alleged by Plaintiff in the proposed Second Amended

Complaint, Defendants acted in bad faith by refusing to investigate his claims about his

Policies for "seven years."  (#42-2 at p. 17, ¶ 71)   Assuming Plaintiff's statement is true,

Defendants' alleged bad faith occurred and the cause of action accrued in 2001, six years

before Plaintiff's original complaint was filed.  Moreover, in his amended brief in

opposition to Jefferson's motion for summary judgment, Plaintiff relies on email

correspondence written by Jefferson's actuaries on October 10, 1997 and December 29,

1997, and correspondence Defendants sent to him on December 23, 1997, to establish his

claim of bad faith. (#80 at pp. 18-19)

Plaintiff again attempts to argue the statute of limitations should be tolled because

Defendants fraudulently concealed facts that would have put him on notice of the bad

faith.  As set forth above, however, a beneficiary's ignorance of his rights does not

prevent the operation of the statute of limitations.  See *First Pyramid Life Ins. Co. v.*

*Stoltz*, 311 Ark. at 319.

In this case, Plaintiff has not produced evidence of affirmative and fraudulent acts

of concealment on the part of Defendants to conceal the claim.  Instead, as indicated

---

[8]For purposes of this Recommended Disposition, the Court assumes, without deciding, that the claims Plaintiff raises in the Second Amended Complaint relate back to the claims he raised in his original complaint.

above, Plaintiff and his counsel had regular correspondence with Defendants regarding

his Policies since he purchased the Policies in 1988.  Accordingly, Plaintiff knew or

should have known of the facts he now alleges establish bad faith, and the Court

recommends that Plaintiff's motion to amend to add a bad faith claim against Defendants

be denied as futile.

### B.      Fraudulent Misrepresentation

Like the statute of limitations for bad faith, the statute of limitations for fraudulent

misrepresentation is three years.  See ARK. CODE ANN. § 16-56-105 (Lexis 2005); *Martin*

*v. Equitable Life Assur. Soc. of the U.S.*, 344 Ark. 177, 182, 40 S.W.3d 733, 737 (2001).

Plaintiff's claim for fraudulent misrepresentation is, therefore, also barred if it accrued

before August 17, 2004.  In his proposed Second Amended Complaint, Plaintiff claims

two fraudulent misrepresentations on which he allegedly relied to his detriment.  First, he

claims Mr. Fakouri made statements about the terms of the Policies in 1987 and 1988.

Second, Plaintiff claims Jefferson made misrepresentations about the terms of the Policies

in a letter to him dated April 14, 2003.  Based on the facts alleged by Plaintiff, his

fraudulent misrepresentation claim accrued, at the latest, in April, 2003.  Accordingly,

Plaintiff's claim is barred by the statute of limitations, and the Court recommends that his

motion to amend to add the claim be denied as futile.

C.      **Declaratory Judgment**

Plaintiff also seeks to amend to raise a new claim for "declaratory judgment."  In his "declaratory judgment" claim, Plaintiff asks the Court to declare that the Policies include terms he claims Mr. Fakouri promised him in 1988.

A declaratory judgment declares rights, status, and other legal relationships whether or not further relief is or could be claimed.  ARK. CODE ANN. § 16-111-103(a) (Lexis 2005); see also *Martin*, 344 Ark. at 181.  A declaratory judgment action is not a substitute for ordinary causes of action, and is intended to supplement, rather than supersede, those causes of action.  *City of Fort Smith v. Didicom Towers, Inc.*, 362 Ark. 469, 209 S.W.3d 344 (2005); *Martin v. Equitable Life Assur. Soc. of the U.S.*, 344 Ark. 177, 40 S.W.3d 733 (2001).

Ordinarily, a declaratory judgment determines the obligations of the insurer under an insurance policy.  *Martin*, 344 Ark. at 180.  In this case, however, Plaintiff is not seeking a determination of his rights under the policy, but rather seeks to have the Policies reformed to conform to representations allegedly made to him by Mr. Fakouri.  "Reformation of contract is available where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the other party, and that is sought by an action seeking reformation, not by a proceeding for declaratory judgment."  *Id*. at 180-81.  Accordingly, the Court recommends that the District Court deny Plaintiff's request to amend his complaint to bring a declaratory judgment action.  Such a claim is a

futile attempt by the Plaintiff to substitute a new claim for his time-barred breach of contract claim.  See *Martin*, 344 Ark. at 181.

      **D.**    **Damages and Attorneys' Fees**

      Plaintiff also brings separate claims for enhanced penalties under Ark. Code Ann. § 4-88-201, *et seq*., attorney's fees and a twelve percent penalty under Ark. Code Ann. § 23-79-208.  Because the Court recommends that the District Court dismiss Plaintiff's substantive claims as barred by the statute of limitations, it recommends that the District Court also dismiss Plaintiff's claims for enhanced damages and attorneys' fees as moot.

**VI.**    **<u>Conclusion</u>**:

      For the reasons set forth above, the Court recommends that the District Court GRANT Defendants' Motions for Summary Judgment (#53, #59, #62) and DENY Plaintiff's Motion to File Amended Complaint (#42).  It is furthered recommended that the Court DENY Plaintiff's Motion to Compel (#44); Defendant Jefferson's Motion to Compel (#45); Defendant Jefferson's Motion to Exclude Testimony of Plaintiff's Expert (#57); and Defendant Protective's Motion to Exclude Testimony of Plaintiff's Expert (#60) as moot.

      DATED this 2nd day of October, 2008.

                  _____

                  UNITED STATES MAGISTRATE JUDGE